J-A06018-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| THOMAS H. REYNOLDS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KELLY A. REYNOLDS | : | No. 889 WDA 2021 |

Appeal from the Order Entered June 30, 2021
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD18-009323-004

BEFORE: MURRAY, J., SULLIVAN, J., and COLINS, J.[*]

MEMORANDUM BY SULLIVAN, J.: **FILED: MAY 9, 2022**

Thomas Reynolds ("Father") appeals from the final order awarding Kelly Reynolds ("Mother") sole legal and physical custody of the parties' daughters, G.R. and S.R. (collectively, "the Children"), born in February 2005 and November 2007, respectively.[1,2] We affirm.

Father and Mother married in 2000, and after years of discord, they separated in 2018. Around the time of their separation, Father and Mother initially agreed that Mother would continue to live with the Children in the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Because neither party has applied to this Court for the use of the parties' initials, we refer to the parties' full names given in the trial court's caption. **See** Pa.R.A.P. 904(b)(2); Pa.R.A.P. 907.

[2] The parties' eldest daughter, K.R., turned 18 years old during the litigation of this custody matter, and she was not a subject of the trial court's final order or this appeal.

marital home, Father would move out, and the Children would have dinner once a week with Father.

Father commenced the underlying custody action in January 2019, seeking shared legal and physical custody. Mother, Father, and the Children began family therapy and mediation with Kathryn Gibson ("Ms. Gibson"). The Children also began mental health treatment. Father filed numerous emergency motions for special relief documenting his concerns over his deteriorating relationship with the Children. *See* Motion for Special Relief-Custody, 5/16/19, at unpaginated 2-4; Motion for Special Relief-Custody, 8/12/19, at unpaginated 2-4. Father alleged Mother interfered with his custodial time, his access to the Children's treatment records, and his relationship with the Children. Father also alleged that the Children suffered increasing mental health issues while under Mother's care. Throughout 2019, the trial court granted Father periods of physical custody, which increased from supervised custody to unsupervised overnight custody. *See* Interim Consent Order, 8/12/19; Interim Order, 11/26/19.

However, the relationship between Father and the Children continued to deteriorate. G.R., who had previously exhibited signs of "anxiety" and "sensory difficulties," suffered a marked decline in her mental health and physical condition. *See* Trial Court Opinion, 9/28/21, at 8-9. She developed insomnia, gastrointestinal issues, and nightmares, and was eventually diagnosed with post-traumatic stress disorder ("PTSD"), anxiety, depression,

and migraines. *See id*. S.R. also exhibited signs of PTSD.[3] *See* N.T., 7/8/20, at 868-70, 1223-24. In August 2019, based on the recommendation of G.R.'s mental health provider, the trial court excused G.R. from attending Father's custodial time and family therapy sessions. *See* Order, 8/12/19. By April 2020, Father exercised none of his custodial time with the Children, and the family stopped seeing Ms. Gibson. *See* N.T., 7/8/20, at 892, 907.

In June and July 2020, the trial court conducted a nine-day custody trial. Father and Mother were represented by counsel and both testified. The parties called expert witnesses. Mother presented testimony from a court-appointed psychologist, Eric Bernstein, Psy.D. ("Dr. Bernstein"), and Father presented the testimony of Robert Evans, Ph.D. ("Dr. Evans"). Dr. Evans discussed Father's claim that Mother had engaged in "parental alienation" based, in part, on his review of Dr. Bernstein's reports.[4] Additionally, Mother and Father each called a therapist to discuss proposed therapeutic interventions for the family. The Children testified *in camera*.

On July 31, 2020, the trial court entered an interim custody order for shared legal custody and Mother's primary physical custody of the Children. *See* Interim Custody Order, 7/31/20. The court rejected Father's claim that Mother engaged in parental alienation. *See id*. ¶ 3. The trial court directed

---

[3] K.R. was also diagnosed with PTSD.

[4] Dr. Evans described parental alienation as "where you have someone encouraging [or] reinforcing" a child's rejection of a parent. N.T., 6/19/20, at 441.

therapeutic intervention for the family with Mother's proposed therapist, Dr. Ruth Zitner.[5]  The trial court directed Father and Mother to attempt to agree to the entry of a partial custody order within ten days of the conclusion of Dr. Zitner's therapy, or, if they could not agree, submit a proposed final custody order within twenty days of the conclusion of Dr. Zitner's therapy.  The court noted on the record that it would enter its final order without further evidence or testimony.  *See* N.T., 7/31/20, at 1691, 1694.  Father did not object to the timing set forth in the interim custody order or the trial court's ruling that it would decide the case without further evidence.  *See id*. at 1695.

In March 2021, Mother requested the entry of a final custody order, claiming, in part, that Dr. Zitner's therapeutic intervention had ended unsuccessfully.[6]  Mother requested sole legal and physical custody of the Children.  Father opposed Mother's request and objected to Mother's attempt to introduce new evidence regarding Dr. Zitner's therapeutic intervention without an additional hearing.  Further, Father proposed that the trial court

---

[5] The court directed that G.R. receive clearance from her mental health provider to participate in family therapy with Dr. Zitner and allowed her to choose whether to participate.

[6] Mother filed a protection from abuse ("PFA") petition against Father due to alleged threatening messages he left her.  *See* N.T., 3/10/21, at 5-6. Following a hearing in March 2021, the PFA court dismissed Mother's petition. The PFA court noted that Father's language was "obnoxious, inappropriate, and consistent with the level of vitriol that was expressed in many documented . . . messages," but determined that his conduct did not "rise to the level of placing someone in reasonable fear of imminent serious bodily injury."  *Id*. at 35.

direct Father and the Children to attend his preferred therapeutic intervention program at Turning Points for Families.

The trial court convened a hearing and placed its findings on the record. The court awarded Mother sole legal and physical custody of the Children. *See* N.T., 5/21/21, at 3-16. On June 30, 2021, the court entered the final custody order.[7] Father timely appealed and complied with Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive Rule 1925(a) opinion.

Father raises the following issues, which we have reordered for review:

1. Whether the [t]rial [c]ourt abused its discretion and committed an error of law in its application of the custody factors at 23 Pa.C.S.A. § 5328.

2. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law in its consideration of Factor 2 and 2.1 by finding the factor weighs in favor of Mother, despite no evidence of abuse by Father, no evidence of risk of harm to the [C]hildren or the other parent by Father, and no evidence of Father being unable to provide adequate physical safeguards and supervision of the [C]hildren.

3. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law by concluding that the [C]hildren had "genuine fear" of Father, despite the lack of evidence about abuse and where eyewitnesses to custody between Father and the [C]hildren disputed the testimony of the [C]hildren.

4. Whether the [t]rial [c]ourt abused its discretion and erred as a matter [of] law by finding that Factor 7 favored Mother where the preference of the [C]hildren was not mature, nor

_____

[7] The court's final order permitted the Children to visit and communicate with Father at their discretion. It also granted Father access to the Children's school, medical, and extracurricular records, and required Mother to share information concerning the Children's health and welfare.

- 5 -

well-reasoned, and the judgment of the [C]hildren was impaired.

5. Whether the [t]rial [c]ourt abused its discretion in determining that Factor 1, regarding encouraging frequent and continuing contact, favors Mother where the [c]ourt admits in the factors analysis that Mother has not supported Father's contact with the [C]hildren and that "neither parent is blameless" and where the [t]rial [c]ourt incorrectly stated that Father proposed cutting off all of Mother's custody time, and the [t]rial [c]ourt was incorrect to consider statements and proposals in Father's pretrial statement as record evidence.

6. Whether the [t]rial [c]ourt abused its discretion as to Factor 8, attempts to turn the child against the other parent, by determining that the factor favored Mother even where the [c]ourt acknowledged that Mother is not guiltless and that both parties exhibited problematic conduct.

7. Whether the [t]rial [c]ourt abused its discretion in finding that Factor 13, willingness and ability to cooperate, favored Mother where the [c]ourt openly admits that neither party is able to cooperate and that neither party is blameless.

8. Whether the [t]rial [c]ourt abused its discretion in finding that Mother did not engage in parental alienation, where the [c]ourt appointed psychologist, deemed credible by the [t]rial [c]ourt, testified that Mother had engaged in parental alienation and "parental alienation syndrome" was not argued by Father's expert, contrary to the finding of the [c]ourt.

9. Whether the [t]rial [c]ourt abused its discretion in considering Father's work ethic without consideration of Father's availability to the [C]hildren in conjunction with the ability to make appropriate child[-]care arrangements, as set forth in the [c]ourt's analysis of Factor 12.

10. Whether the [t]rial [c]ourt abused its discretion in finding that Father never had a sturdy, strong bond with the [C]hildren where Father, Mother and the [C]hildren lived together as an intact family until the [C]hildren were 13 and 10 years old before the separation in October 2018, and where Father did

attempt to engage in custody and vacations with the [C]hildren after the separation.

11. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law in awarding Mother sole legal custody of the [C]hildren.

12. Whether the [t]rial [c]ourt abused its discretion and committed an error of law by entering an order which provided Mother with sole physical custody, and Father with zero scheduled custody of the [C]hildren, except custody which is specially requested by Father, with said request being filtered through Mother, and which will take place only at the discretion of the [C]hildren, where the [C]hildren are clearly unreasonable in their hesitance to engage in custody with Father.

13. Whether the [t]rial [c]ourt abused its discretion and erred as a matter of law in awarding Father zero custodial periods, and failing to award additional reunification programs, where there was no credible evidence that Father is a threat to the [C]hildren or to Mother.

14. Whether the [t]rial [c]ourt erred in failing to order the use of Father's proposed reunification counseling, which counseling had a much higher chance of success, instead ordering the use of Mother's expert's reunification counseling, which had a lower chance of success, and which in fact failed.

15. Whether the [t]rial [c]ourt abused its discretion and committed an error of law by refusing to allow Father the right to call Kathryn Gibson, an independent witness knowledgeable about the case, on rebuttal and by refusing to allow Father to testify on rebuttal.

16. Whether the [t]rial [c]ourt abused its discretion and committed an error of law by entering only an interim order following the parties' nine-day custody trial and by only entering a final order on May 21, 2021, without allowing any further testimony or admission of evidence be presented.

Father's Brief at 4-8.

Father's first ten issues contend that the trial court abused its discretion when deciding the Children's best interests under the Child Custody Act ("the Act"), 23 Pa.C.S.A. §§ 5321-5340.

In custody cases under the Act, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

This Court consistently has held that

> the discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

In addition,

> [a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a

review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

**M.A.T. v. G.S.T.**, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (internal citations omitted).

It is well settled that in any custody case decided under the Act, the paramount concern is the best interest of the child. **See** 23 Pa.C.S.A. §§ 5328, 5338. Section 5328(a) sets forth the best interest factors that a court must consider in awarding custody. **See E.D. v. M.P.**, 33 A.3d 73, 79-80 n.2 (Pa. Super. 2011). Specifically, section 5328(a) provides:

> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
> >
> > (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> >
> > (3) The parental duties performed by each party on behalf of the child.
> >
> > (4) The need for stability and continuity in the child's education, family life and community life.
> >
> > (5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

The record on appeal must clearly demonstrate that the trial court considered **all** of the factors listed in section 5328(a). ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011).

Section 5323(d) provides that a trial court shall delineate the reasons for its decision on the record in open court or in a written opinion or order. Additionally, section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen section 5328(a) custody factors prior to the deadline by which a litigant must file a notice of appeal. . ..

In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with section 5323(d).

*A.V. v. S.T.*, 87 A.3d 818, 822-23 (Pa. Super. 2014) (internal citations, quotation marks, and brackets omitted). In addition to our deference to the trial court's credibility and weight determinations, we are mindful that it is within the trial court's purview as finder of fact to determine which factors are most salient and critical in each particular case. *See M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013).

In his second, third and fourth issues, Father claims that the trial court abused its discretion or erred in finding that he posed a threat to the Children's welfare. As to factor 2 (present and past abuse) Father asserts that the record established he did not physically abuse or harm the Children.[8] Father's Brief at 45 (discussing the definition of "abuse" under the PFA Act). Father maintains that his "angry outbursts" and "hateful language" did not place the

---

[8] Father also contends that the trial court also failed to consider factor 2.1, which required the court to consider information from reports of child abuse related to child protective services. *See* Father's Brief at 45. However, he acknowledges that there was no evidence that child protective services were involved in this case. *See id*.

- 11 -

Children in reasonable fear of imminent serious bodily injury. *Id*. at 45-47, 49. In conjunction with factor 7 (preference of the child), Father claims that the Children did not "genuinely fear" him and that their stated preferences not to see him based on minor episodes and complaints evidenced their immaturity and lack of informed insight. *See id*. at 48, 50-51, 53-56.

The trial court, in its Rule 1925(a) opinion, explained its finding of abuse under factor 2. The court recognized that "physical abuse was not the issue in this case." Trial Court Opinion, 9/28/21, at 24. The court noted, however, that Father ignored the testimony that his anger management issues, "create[d] a fearful atmosphere that is unpleasant and unpredictable enough to create a sense of threat to the Children." *Id*.

The trial court continued that an "aggravating factor" in the family dynamics "has always been the unpredictable nature of Father's outbursts, which created a household filled with tension." *Id*. The court found credible an incident when Father got angry at S.R. when she missed shaking hands with their priest and punished her by making her get out of the car and walk home. *See id*. at 4-6. Further, the court found that Father cursed and got angry for days when he thought K.R. hit him when they were playing in a pool on vacation. *See id*. at 4-6. The court further explained:

> Throughout the trial, it became evident to this Court that Father is easily hurt and readily perceives himself as the subject of criticism and disrespect, which in turn often leads to his outbursts. At one time, the family got a puppy, and K.R. picked the dog up, but Father believed K.R. was holding the dog like a "forklift." He couched his complaint as an act of caring in that he stated he feared the dog would bite K.R., but his actions included

throwing scissors down onto the kitchen island and yelling. He went outside, apparently to cool off, but did not regain control and began "telling the kids they're horrible and they're disrespectful and that they're going to hurt the dog . . .."

*Id*. at 6.

Additionally, the trial court found that "Father has thrown objects, shouted and used aggressive language . . . and that [he] acknowledged that the [C]hildren had witnessed Father throwing objects in anger." *Id*. at 24. The court concluded that "Father's hair-trigger outbursts create an emotionally oppressive environment" for the Children creating a "grinding, relentless[,] and exhausting psychological oppression that results from endless conflict." *Id*. Further, when weighing the Children's preferences pursuant to factor 7, the court found that the Children "appear[ed] coherent, gave reasons for their preferences[,] and did not seem immature and arbitrary in their wishes" not to see Father. *Id*. at 28.

Our review establishes that the record supports the trial court's findings. The trial court had the opportunity to observe all of the witnesses in person and over the course of the lengthy litigation in this custody matter. In particular, we note that the trial court credited Dr. Bernstein's opinions that Father's physical outbursts should not be minimized. N.T., 6/10/20, at 176. As Dr. Bernstein explained:

If the [C]hildren are viewing anything from throwing objects or the effect of punching a wall or anything of that nature, that signifies and communicates a message to the [C]hildren that there's a propensity for violence, that if they, for example, say the wrong thing or if they upset their father, that they could ultimately, even if it's not rational, that they could ultimately be

> victim to that sense of explosiveness. And even though it may never have directly impacted them physically, that doesn't remove the fear that may be associated with those actions.

*Id*. at 176-77.

Although Father's conduct may not rise to the level of the legal definition of "abuse" in other contexts, it was within the province of the trial court, in assessing the Children's best interest, to credit Mother's, the Children's, and Dr. Bernstein's testimony on how Father's conduct affected the Children over the course of years, and how his lack of insight exacerbated the situation between them. As the trial court noted, the Children are particularly sensitive; yet, Father does not appreciate how his anger and conduct affects them. *See* Trial Court Opinion, 9/28/21, at 12, 24-25. Rather, he attempts to minimize their feelings toward him as overreactions to minor outbursts. *See* Father's Brief at 46, 55-56. Based on the foregoing, we discern no abuse of discretion in the trial court's findings that factors 2 and 7 favored Mother.[9]

Father's next four issues, five through eight, focus on factors 1 (encouragement of contacts), 8 (attempts to turn the child against the other parent), and 13 (conflict between the parties and ability to cooperate). *See* Father's Brief at 38-41, 57-58, 61-62. Father emphasizes the trial court's finding that neither he nor Mother are "blameless," and highlights the evidence that Mother engaged in parental alienation and discouraged Father's

_____

[9] Even if the trial court abused its discretion in considering Father's conduct abuse, it was free to consider the Children's reactions to his angry outbursts under the catch-all provision of section 5328(a)(16).

- 14 -

relationship with the Children. *See id*. at 39-40, 58. Father asserts that Mother turned the Children against him by overprotecting them and by discouraging them from having a relationship with him. *See id*. at 39-40, 58.

The trial court responds to these issues as follows:

> [As to factor 1, t]his [c]ourt did not find that Mother has failed to support Father's contact with the [C]hildren; rather this Court found that "over time, Mother has shown more willingness than Father" to refrain from poisoning the [C]hildren's relationship with Father. Further, this Court found that Mother was credible in her "willingness and her effort to create a more harmonious family relationship," and that to the contrary, a similar finding could not be made about Father. . .. Father is simply wrong in his representation of the findings.
>
> Second, the [c]ourt's findings are based on ample and competent evidence. Father testified that he filed a motion because Mother was not encouraging contact between him and the [C]hildren, but then he gave many examples of times when Mother did try to arrange interactions, even during periods of high tension. . .. Mother herself testified credibly that she did try to reinforce to the [C]hildren that their Father loves them and believes that improved relations would benefit the whole family.

Trial Court Opinion, 9/28/21, at 20-21.

Concerning factor 8, the trial court found that Mother attempted to encourage a better relationship with Father and demonstrated "some willingness to curb the Children's rejecting behavior." *Id*. at 29. The court noted that "Mother made her mistakes, such as occasionally correcting Father in front of the [C]hildren, but overall, Mother took some affirmative steps to avoid poisoning the [C]hildren's views of their Father." *Id*. The court specifically noted that Mother did not tell the Children about Father's arrest for driving under the influence of alcohol, and "has not made a habit of telling

the [C]hildren when Father writes disparaging messages about them, such as calling them bitchy." *Id*. Regarding factor 13, the trial court further noted that the level of conflict between Father and Mother remained high, but that Father's "role in the conflict is too frequently aggressive to leave room for cooperation" between the parents. *See id*. at 31.

Turning to Father's claim of parental alienation, the trial court explained:

> Dr. Bernstein did indicate that Mother is a contributor to some of the difficulties, even by asking the [C]hildren to discuss their feelings she becomes viewed as a favorite parent. However, he also testified that her own parenting behaviors do not signify parental alienation, that this is not a case in which parental alienation is the core of the problem in the family dynamic and that the [C]hildren view Mother as calmer and more predictable because she is the calmer and more predictable parent.
>
> This [c]ourt credited Dr. Bernstein's testimony . . .. The unmistakable gravamen of that testimony does not support Father's claim. In other words, Dr. Bernstein did not view Mother as engaged in substantial parental alienation.

*Id*. at 40. The court proceeded to note that Father viewed Mother as the cause of all of the family's difficulties and attributed the Children's reactions to him as parental alienation. *See id*. at 35.

Following our review, we discern no abuse of discretion in the trial court's findings and reasoning. The court recognized the complex family dynamics in this case. Dr. Bernstein's and the Children's testimony supported the court's decision to favor Mother when deciding which party was more likely to encourage contact and less likely to attempt to turn the Children against the other party. *See* N.T., 6/10/20, at 88-89; N.T., 7/28/20, at 1546, 1565-

66. Further, the trial court balanced the level of conflict between Mother and Father and its determination that Father's approach undermined the parents' ability to cooperate. Lastly, the trial court carefully considered the evidence regarding parental alienation, and it was entitled to credit Dr. Bernstein's opinions when finding that Mother did not engage in parental alienation and rejecting Father's claim that parental alienation was at the core of the family dynamics. Thus, Father's claims as to factors 1, 8, and 13 merit no relief.

Next, in his ninth issue, Father asserts that the trial court abused its discretion in weighing factor 12 (availability to care for the child or make child-care arrangements) in favor of Mother. Father contends that he was able to make appropriate child-care arrangements as recognized by the trial court, but that the court incorrectly focused on Mother's ability to personally care for the Children. Father's Brief at 59. We discern no abuse of discretion in the trial court's decision to weigh this factor in favor of Mother, who is a stay-at-home parent. *See* Trial Court Opinion, 9/28/21, at 31. Therefore, this issue warrants no further discussion.

In his tenth issue, Father claims that the trial court abused its discretion when finding that he and the Children never had a strong bond. Father asserts that his exhibits showed "the great relationship that he had with his daughters prior to separation." Father's Brief at 75. Father contends that the evidence of his bonding with the Children was relevant to the trial court's consideration of factors 3 (parental duties performed by each party), 4 (need for stability

and continuity), 9 (party is more likely to maintain relationship with the child), 10 (party is likely to attend to the needs of the child). **See *id*.** at 79 n.19.

The trial court, when entering its findings of fact into the record, stated that Father "never had a strong and sturdy bond with the [C]hildren as he devoted much of his time during the marriage to his work." **See** N.T., 5/21/21, at 5. In its Rule 1925(a) opinion, the trial court further explained that "there was clearly a relationship" between Father and the Children, but "Father did not have a strong bond with the [C]hildren prior to the separation because he was not often home, and the relationships were strained before the separation." Trial Court Opinion, 9/28/21, at 37. The trial court credited Dr. Bernstein's testimony that Father did not have a significant parent caretaking level of responsibility, which, in turn, impacted on the strength of his bond with the Children. ***Id*.** (citing N.T., 6/20/20, at 182). Notably, the court found that Father was unable to preserve or build upon his relationship after the parties separated. ***Id*.**

As we find support in the record for the trial court's conclusion that Father and the Children had a relationship, but that their relationship had soured to the point discussed at the custody trial, we find no abuse of discretion in the trial court's consideration of Father's bond with the Children.

Next, in his eleventh issue, Father argues that the trial court erred in awarding Mother sole legal custody. **See** Father's Brief at 23-31. When deciding the form of custody, including sole legal and physical custody, section 5328 directs the trial court to consider all of the sixteen factors to determine

- 18 -

the best interest of the child. 23 Pa.C.S.A. §§ 5323(a) (defining forms of custody), 5328(a) (enumerating the sixteen factors); *see also S.W.D. v. S.A.R.*, 96 A.3d 396, 401-02 (Pa. Super. 2014) (enumerating the factors and requiring that a court consider all factors).

Father, relying on cases decided prior to the passage of the Act, argues that there was evidence that he and Mother "are capable of exhibiting the minimal degree of cooperation necessary for a shared legal custody arrangement." Father's Brief at 25-30.

The trial court here examined the behaviors of the parties and noted Father's failure to promptly respond to Mother, as well as his hostility toward Mother. *See* Trial Court Opinion, 9/28/21, at 32-33. The trial court specifically concluded that Father's level of hostility and the parties' level of conflict impairs their ability to cooperate. *See* N.T., 5/21/21, at 14 ("The level of conflict in this case is high . . . and impairs both parties' ability to cooperate. . . . Father's role in the conflict too frequently takes form of aggression, primarily verbal. . . ."); *see also* Trial Court Opinion, 9/28/21, at 32-33 ("In light of the respective conduct of the parties, this [c]ourt concluded that sole legal custody was appropriate because of the inability of the parties to avoid hostilities resulting from efforts to work together."). The trial court also noted that Father's hostility to Mother overshadowed his care for the Children at times. *See id*. at 32 (noting that Father responded to serious news about G.R. by asking, "Is there any good news ever about our [] daughters? Your continual diary of their sadness and failings is quite depressing.").

Here, while the record shows some indication that the parents could cooperate, Father's own testimony also confirmed his frustration with Mother; his own use of sarcasm when dealing with her; and his growing frustration over the entire family dynamic, including the Children. **See** N.T., 7/8/20, at 655-58 (noting that while Father initially agreed to G.R.'s participation in extracurricular program, he later stated he "may object" with a "lot of sarcasm," because he was annoyed with Mother's repeated questions). On other occasions, he was expressly hostile towards Mother. **See id**. at 759-60 (replying to a message regarding K.R.'s therapy, "I hate you. You revel in our daughters' ailments. There's a place reserved for you in hell. You're sick, and you need to be in therapy"); **see also id**. at 790 (responding "FU" to Mother); **see also id**. at 894-95 (referring to Mother as "a super bitch" and the Children as "bitchy"). Hence, the record supports the trial court's findings that Father's hostility to Mother impaired the parties' ability to cooperate. Given the best-interests analysis conducted by the trial court pursuant to section 5328(a), we do not disturb the award of sole legal custody.

In his next two issues, twelve and thirteen, Father challenges the trial court's award of sole physical custody to Mother.[10] **See** Father's Brief at 31-36. As noted above, we review the trial court's determination on the form of

---

[10] Father addressed these issues, both dealing with the physical custody award, together in his brief and we, likewise, address them together, since they are interrelated.

custody in light of the child's best interest findings pursuant to section 5328(a).

Father asserts that the record lacks evidence of abuse or addiction. *See id*. at 32. Further, while he acknowledges he has a temper, Father contends the record fails to support that he has a severe mental or moral deficiency representing a threat to the Children's welfare. *See id*. at 33. As a result, Father argues that the court failed to protect his parental rights and his right to maintain a relationship with the Children, essentially terminating his parental rights. *See id*. at 33, 35-36.

In support of its award of sole physical custody, the trial court declined to force a relationship between Father and the Children. Trial Court Opinion, 9/28/21, at 33. Relying on testimony from Dr. Bernstein, the court stated, "This [c]ourt finds that forcing the relationship at this point—without real evidence of progress, especially on Father's part—poses a grave emotional threat to the [C]hildren's welfare." *Id*. The court further noted the family's exhaustion with therapy and likelihood that it will fail to result in progress. *Id*. at 36.

Following our review, we conclude the trial court analyzed and addressed each factor as required by section 5328(a) in determining sole physical custody. *See* 23 Pa.C.S.A. § 5328(a); *see also E.D.*, 33 A.3d at 79-80 n.2; *J.R.M.,* 33 A.3d at 652. We emphasize the amount of weight that a trial court gives to any one factor is almost entirely within its discretion. *See M.J.M.*, 63 A.3d at 339. We add that the trial court's findings concerning the

family's exhaustion with therapy was supported by the Children's testimony at the custody trial. Additionally, as noted by the trial court, Dr. Bernstein concluded that forcing contacts or relationships between the Children and Father was tantamount to creating more distress for the Children. *See* N.T., 6/10/20 at 180-81. Father is thus due no relief.

Father's fourteenth issue challenges the trial court's decision to reject his request for additional reunification therapy. Father's Brief at 79-80. For background, at the custody trial, Father and Mother presented witnesses for additional therapeutic interventions for the family. Father presented testimony from Linda Gottlieb ("Ms. Gottlieb"), who discussed the Building Bridges for Families Program. Ms. Gottlieb's practice focused on parental alienation. She recommended the Children undergo treatment, which preferably, would take place while cutting the Children off from the alienating parent (*i.e.*, Mother) for ninety days. The trial court, as noted above, selected Mother's proposed provider, Dr. Zitner, to provide therapeutic interventions for the family when it entered the July 31, 2020 interim custody order. However, after Dr. Zitner's therapy did not succeed and Mother sought a final custody order, Father requested additional therapeutic interventions based on his previous proposal.

Father argues that Ms. Gottlieb has a high success rate and that her reunification therapy has been accepted by this Court. Father's Brief at 82-83. Father attacks the trial court for "coddling" the Children and rejecting further interventions based on "fatigue." *Id*. at 80.

The trial court, in its Rule 1925(a) opinion, explained its decision not to order further therapeutic interventions, reasoning that "this family is exhausted with therapy, and they have undergone a significant amount of counseling, which did not overall result in significant improvements." Trial Court Opinion, 9/28/21, at 38. The court continued:

> Father's proposed therapist was a social worker with a long history of working with cases of parental alienation. This [c]ourt did not find parental alienation in this case. Consequently, the [c]ourt found that this brand of therapy would impose upon the family an inapplicable framework that would frustrate the therapeutic work of the participants examining their own behavior and their group dynamics.

*Id*. at 38-39.

The record supports the trial court's decision not to compel further therapeutic interventions for the family. As to Father's proposed therapeutic intervention, Dr. Bernstein explained that the Children already blamed Father for their "upset and family dysfunction." *Id*. at 191. Therefore, according to Dr. Bernstein, placing them away from Mother in a program for the purpose of rebuilding or reconnecting with Father "could result in further trauma and/or distress for the [Children]." *Id*. Furthermore, the record confirms the trial court's findings that after their unsuccessful attempts at therapy with Ms. Gibson and Dr. Zitner, the Children were exhausted, and that further court-ordered interventions were not in their best interests. Thus, no relief is due.

In his fifteenth issue, Father challenges the trial court's decision to overrule his request to present rebuttal evidence. This Court reviews the trial

court's evidentiary ruling for an abuse of discretion. **K.T. v. L.S.**, 118 A.3d 1136, 1165 (Pa. Super. 2015).

> Generally[,] the admission of rebuttal evidence is a matter within the sound discretion of the trial court. Rebuttal evidence is proper where it is offered to discredit testimony of an opponent's witness. [W]here the evidence goes to the impeachment of his opponent's witness, it is admissible as a matter of right. Furthermore, in order to constitute proper impeachment evidence, the rebuttal witness' version of the facts must differ from that of the witness being impeached.

**American Future Systems, Inc. v. BBB**, 872 A.2d 1202, 1213 (Pa. Super. 2005) (internal citation and quotations omitted).

Father argues Ms. Gibson, the family counselor/mediator who worked with the family before the custody trial, would have been able to resolve conflicts in testimony and address several of relevant custody factors and testify that Father did not have angry outbursts. Father's Brief at 85-89. As to his testimony on rebuttal, Father argues that he had not testified since the second day of trial and, specifically, could have offered rebuttal testimony as to the proposed reunification therapy programs offered by each of the parties. **Id**. at 89.

Initially, we agree with the trial court that Father waived his claim that the trial court abused its discretion by failing to object at the custody trial and agreeing not to call his rebuttal witnesses. **See** N.T., 7/31/20, at 1639; **see also** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal"). In any event, we also agree with the trial court that this claim lacks merit. Further, Father proffered Ms.

Gibson to testify regarding custody factors, he should have done so in his case-in-chief. To the extent Father proffered his own testimony regarding the treatment alternatives offered at the custody trial, his testimony would have been cumulative. Accordingly, no relief is due.

In his sixteenth issue, Father challenges the trial court's decision to enter an interim custody order following trial and then enter a final order without further testimony or evidence. *See* Father's Brief at 90. Pennsylvania Rule of Civil Procedure 1915.4 provides in part as to prompt decisions:

> The judge's decision shall be entered and filed within 15 days of the date upon which the trial is concluded unless, within that time, the court extends the date for such decision by order entered of record showing good cause for the extension. In no event shall an extension delay the entry of the court's decision more than 45 days after the conclusion of trial.

Pa.R.Civ.P. 1915.4(d).

Father argues that the court did not issue a final order until two hundred ninety-four days after the conclusion of trial in contravention to Pa.R.Civ.P. 1915.4(d). Father's Brief at 90. He asserts that he experienced prejudice as he was required to wait for eight months to appeal a final order. *Id*. at 91. Father contends that he suffered prejudice because he was "forced to languish" to appeal the terms of the interim custody order, which he disagreed with, and proved unsuccessful. *Id*.

The trial court explained its decision to enter the interim custody order as follows:

> [T]his [c]ourt explained and stands by the conclusion that this was not an ordinary situation, and that given the serious

- 25 -

issues in the family and the problems demonstrated by [G.R.], extra measures were warranted. In entertaining questions from the parties at the conclusion of trial and the time of the making of the [interim custody o]rder, Father only raised a concern about how to share the costs of therapy. In any event, it is difficult to see any prejudice to Father from the interim order. . .. During the period of the interim order, his legal custody was greater, as was his time with the [C]hildren. Consequently, this argument is without merit, and the measure taken by the [c]ourt without harm.

Trial Court Opinion, 9/28/21, at 48-49 (citations omitted).

The record here shows that Father failed to raise any prior objection as to the issuance of an interim custody order and/or timing of the issuance of a final order. Rather, the record reveals that Father acquiesced and only made inquiry with respect to the cost of the therapeutic intervention with Dr. Zitner. N.T., 7/31/20, at 1694. Father, therefore, waived this issue by failing to raise it in the court below as the matter proceeded. *See* Pa.R.A.P. 302(a); *Fillmore v. Hill*, 665 A.2d 514, 515-16 (Pa. Super. 1995); *see also Bednarek v. Velazquez*, 830 A.2d 1267, 1270 (Pa. Super. 2003). Further, Father had the opportunity to file a petition for modification after the entry of the interim custody order or otherwise bring the issue of custody before the court for consideration, but he did not so do.

In any event, following our review of this appeal, we agree with the trial court that the interim custody order served a beneficial purpose under the circumstances of this case. The court, as the parties acknowledged at the time of the hearing, was attempting to heal the Children's relationship with

Father through additional therapeutic interventions.  As such, this claim merits no relief.

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  5/9/2022